ESTATE OF NEWCOMB CARLTON, DECEASED, WINSLOW CARLTON AND THE CHASE MANHATTAN BANK (SUCCESSOR TO THE CHASE NATIONAL BANK OF THE CITY OF NEW YORK), EXECUTORS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 65119.    Filed September 15, 1960.

*Walter E. Beer, Jr., Esq.*, for the petitioner.
*Theodore E. Davis, Esq.*, for the respondent.

OPINION.

Scott, *Judge:* Respondent determined a deficiency in estate tax in the amount of $110,691.35 for the Estate of Newcomb Carlton.

The issue for decision is whether the entire proceeds of insurance policies, or any part thereof, and the value of securities transferred in trust by decedent are includible in his gross estate.

In his notice of deficiency respondent determined that "the entire proceeds of life insurance policies aggregating $239,327.54 on the life of Newcomb Carlton held by and payable to the Chase Manhattan Bank (successor trustee) under agreement of trust dated February 24, 1930, are includible in gross estate under the provisions of section 811(c), 811(d), and 811(g) of the Internal Revenue Code of 1939."

Respondent further determined that "stock held in the trust of February 24, 1930 is includible in gross estate under the provisions of sections 811(c) and 811(d) of the Internal Revenue Code of 1939, in the value of $34,442.50."

The facts have been stipulated and are found accordingly.

The decedent died on March 12, 1953. The estate tax return was filed with the district director of internal revenue for the Upper Manhattan District of New York.

The decedent, on or about February 24, 1930, entered into a trust agreement with Fletcher L. Gill and the Chase National Bank of the City of New York, and pursuant thereto transferred to the trustees 21 insurance policies on his life which had been acquired by him prior to February 24, 1930, 500 shares of stock of the Chase National Bank—Chase Securities Corporation, and 284 shares of stock of the Bank of Manhattan Trust Company. This instrument was under seal by Newcomb Carlton and Fletcher L. Gill. The decedent paid all premiums on the insurance policies transferred to the trust which became due prior to February 24, 1930, and paid all premiums which were ever paid on the Mutual Benefit Life Insurance Company policy No. 442,870.

The provisions of the trust agreement included the following: That, during the lifetime of the grantor, the trustees should apply the net income of the trust to the payment of premiums upon the policies of life insurance deposited in the trust, and should pay quarterly to the grantor any balance of the net income not required for the purpose of paying such premiums; that after the death of the grantor, the net income of the entire fund as then constituted

should be paid to Winslow Carlton, son of the grantor, during his lifetime, but that upon his reaching the age of 35 years the principal of the trust should be paid over to him, but if Winslow Carlton should die before reaching the age of 35, or predecease the grantor, the principal should be paid as directed by the will of Winslow Carlton; that the grantor intended to part with and grant to the trustees the right to receive all premium dividends on the policies, the right to surrender the same for their respective cash surrender value, to obtain loans on such policies and all other rights and options therein provided for and also all rights in connection with the securities deposited in the trust; in addition to the usual powers of trustees, they could invest and reinvest the principal of the trust in such investments, including preferred and common stock, as the trustees in their discretion might deem for the best interests of the trust estate without being limited to investments authorized by law for trust funds, provided that during the lifetime of the grantor no sales of securities or reinvestments should be made except upon the direction or with the consent and approval of the grantor; the grantor reserved the right to add to the trust estate by depositing additional policies with the trustees made payable to them and/or depositing cash, additional securities or other property with the trustees, all of which should thereupon become subject to the terms of the trust; that the trustees might exercise or dispose of any conversion privileges or subscription rights in connection with the securities comprising the trust estate and might participate in any plan for refunding or adjusting any stocks, bonds, or other securities or enter into any corporate consolidation or reorganization and, subject to the direction or with the approval of the grantor during his lifetime, make such contributions or payments in connection with any such matters as the trustees might deem advisable; that the trustees were to determine any question that might arise as to whether interest, dividends, rights, stock dividends, sale and purchase prices, accruals, receipts, and disbursements of any kind received or paid out by the trustees should be treated and accounted for as income or as principal; that the trustees might invade the principal of the trust fund or borrow on any of the insurance policies in case the net income in their hands was insufficient to pay the premiums then due on the policies; and that the grantor might, in case the net income in the hands of the trustees should at any time not be sufficient to pay the premiums then due on the insurance policies, pay to the trustees any amount sufficient to make up such deficiency, and that the trustees should accept and use such payment for such purpose. The grantor specifically reserved during his lifetime the power to change the age at which Winslow Carlton should receive the princi-

pal of the trust fund, to appoint a successor trustee should a trustee resign, and to remove the trustees with or without cause in his discretion and to appoint a successor trustee or trustees. The trust instrument stated that the trust was irrevocable. The trusts created were to be administered in the State of New York and in all respects governed by the laws of that State.

During the period from February 24, 1930, to the date of the decedent's death on March 12, 1953, the trustees or the trustee applied all of the dividends from the securities in the trust and all dividends received on the insurance policies to the payment of the expenses of the trust and to the payment of premiums on the policies. In no calendar year of the trust were the amounts of dividends on the securities and policies in the trust sufficient to pay the expenses of the trust and the premiums on the policies.

In the period from February 24, 1930, through August 20, 1936, Newcomb Carlton paid a portion of the premiums on the policies but paid no premiums on these policies after that date. During the period August 20, 1936, through March 12, 1953, Winslow Carlton paid a portion of the premiums on the policies. All premiums on the policies in the trust were paid as they became due during the period from February 24, 1930, until March 12, 1953. The total amount of proceeds collected on the insurance policies held in trust on March 12, 1953, was $239,327.54 and the total premiums paid on these policies was $287,027.59. Decedent paid $152,042.24 of the total premiums, the trustees, from the trust income, paid $84,557.37, and Winslow Carlton paid $50,427.98.

On April 30, 1935, Fletcher L. Gill resigned as trustee of said trust. No successor trustee for Fletcher L. Gill was ever appointed.

By agreement, under seal, made May 1, 1935, the decedent and Winslow Carlton and Margaret Mary Carlton, the wife of Winslow Carlton, agreed that in consideration of Winslow and Margaret Mary Carlton agreeing to establish out of such funds as they might receive under the trust agreement dated February 24, 1930, or under the will of the decedent, a fund of such sum or sums of money as might be necessary to provide an annual income of $1,500, each, for the three sisters and one brother of decedent who might survive decedent, the decedent would not change the terms of the trust agreement or of his will without the consent of Winslow and Margaret Mary Carlton.

In a letter dated May 28, 1936, addressed to the Chase National Bank of the City of New York, the decedent stated that he surrendered the right reserved in the trust agreement to change the age at which his son, Winslow Carlton, should be paid the principal of the trust. This letter was delivered to the Chase National Bank of the City of New York.

On May 29, 1936, Winslow Carlton and Margaret Mary Carlton consented to a change in the will of the decedent and to a correction of the date as originally used as the date of the trust agreement in the agreement of May 1, 1935.

On December 7, 1943, the decedent executed, under seal, an instrument stating that he surrendered and relinquished the power and authority reserved to him to direct or consent to the sale of and reinvestment in securities and payments in connection with any reorganizations, consolidations, refundings, or exercise of any conversion privileges or subscription rights and the power to discharge the trustees and appoint successor trustees to trustees so discharged. This instrument was delivered to, and receipt of the document acknowledged by, the Chase National Bank of the City of New York.

The decedent was born on February 16, 1869, and was a resident of the city, county, and State of New York on March 12, 1953, the date of his death. Decedent was a member of the board of directors of the Chase National Bank of the City of New York from February 21, 1917, to September 22, 1948.

Winslow Carlton was born on December 27, 1907, and was over the age of 21 when the trust was created on February 24, 1930. On that date, and at all times thereafter, Winslow Carlton had a will in effect.

The trustee distributed the securities in the trust to Winslow Carlton on May 28, 1953, on which date their value was $32,050. The securities in the trust at its termination consisted of 500 shares of capital stock of the Chase National Bank of the City of New York and 290 shares of capital stock of the Bank of Manhattan Trust Company. The securities were all either originally transferred to the trustees or received in exchange for, or as stock dividends on, the securities transferred. The date of death value of the securities was $34,442.50.

Petitioner contends that no part of the trust corpus, including the proceeds of the insurance policies, is includible in the gross estate under the provisions of section 811(c), 811(d), or 811(g)(2)(A) or (B) of the 1939 Code.[1]

---

[1] SEC. 811. GROSS ESTATE.

The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated, except real property situated outside of the United States—

(a) DECEDENT'S INTEREST.—To the extent of the interest therein of the decedent at the time of his death;

\* \* \* \* \* \* \*

(c) TRANSFERS IN CONTEMPLATION OF, OR TAKING EFFECT AT, DEATH.—

(1) GENERAL RULE.—To the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise—

\* \* \* \* \* \* \*

(B) under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before

Respondent's first contention is that decedent at the date of his death still retained all powers originally reserved to him by the trust instrument of February 24, 1930, which retained powers were of such a nature as to require the inclusion in the gross estate under section 811(d)(2) of the 1939 Code of the entire trust corpus including the proceeds of the insurance policies, relying on *Lober* v. *United States*, 346 U.S. 335 (1953). His position is that the letter dated May 28, 1936, and the instrument executed on December 7, 1943, were ineffectual since Winslow Carlton and his wife did not consent to any alteration of the trust agreement as required by the contract of May 1, 1935.

Respondent argues that because of the provision of the agreement

his death (i) the possession or enjoyment of, or the right to the income from, the property, or (ii) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom; or
(C) intended to take effect in possession or enjoyment at or after his death.
Subparagraph (B) shall not apply to a transfer made before March 4, 1931; nor shall subparagraph (B) apply to a transfer made after March 3, 1931, and before June 7, 1932, unless the property transferred would have been includible in the decedent's gross estate by reason of the amendatory language of the joint resolution of March 3, 1931 (46 Stat. 1516).

\* \* \* \* \* \* \*

(d) REVOCABLE TRANSFERS.—

\* \* \* \* \* \* \*

(2) TRANSFERS ON OR PRIOR TO JUNE 22, 1936.—To the extent of any interest therein of which the decedent has at any time made a transfer, by trust or otherwise, where the enjoyment thereof was subject at the date of his death to any change through the exercise of a power, either by the decedent alone or in conjunction with any person, to alter, amend, or revoke, or where the decedent relinquished any such power in contemplation of his death, except in case of a bona fide sale for an adequate and full consideration in money or money's worth. Except in the case of transfers made after June 22, 1936, no interest of the decedent of which he has made a transfer shall be included in the gross estate under paragraph (1) unless it is includible under this paragraph.

\* \* \* \* \* \* \*

(g) PROCEEDS OF LIFE INSURANCE.—

\* \* \* \* \* \* \*

(2) RECEIVABLE BY OTHER BENEFICIARIES.—To the extent of the amount receivable by all other beneficiaries as insurance under policies upon the life of the decedent (A) purchased with premiums, or other consideration, paid directly or indirectly by the decedent, in proportion that the amount so paid by the decedent bears to the total premiums paid for the insurance, or (B) with respect to which the decedent possessed at his death any of the incidents of ownership, exercisable either alone or in conjunction with any other person. For the purposes of clause (A) of this paragraph, if the decedent transferred, by assignment or otherwise, a policy of insurance, the amount paid directly or indirectly by the decedent shall be reduced by an amount which bears the same ratio to the amount paid directly or indirectly by the decedent as the consideration in money or money's worth received by the decedent for the transfer bears to the value of the policy at the time of the transfer. For the purposes of clause (B) of this paragraph, the term "incident of ownership" does not include a reversionary interest.
[As provided by sec. 404(c), 1942 Act, as amended by sec. 503(a), 1950 Act, Code sec. 811(g), as amended, is applicable as follows:
(c) Decedents to Which Amendments Applicable.—The amendments made by subsection (a) shall be applicable only to estates of decedents dying after the date of the enactment of this Act; but in determining the proportion of the premiums or other consideration paid directly or indirectly by the decedent (but not the total premiums paid) the amount so paid by the decedent on or before January 10, 1941, shall be excluded if at no time after such date the decedent possessed an incident of ownership in the policy. \* \* \*]

of May 1, 1935, between the decedent and his son and daughter-in-law that decedent "will not change the terms of the said trust agreement * * * without the consent" of his son and daughter-in-law, the releases of powers by the decedent subsequent to that date without such consent are void. Respondent does not contend that the agreement of May 1, 1935, was an amendment to the trust instrument and petitioner's brief contains no discussion of such an issue. We have, therefore, not considered the questions of whether the agreement of May 1, 1935, was, under New York law, an amendment to the trust instrument, whether the trust should be considered as irrevocable were this agreement to be considered as an amendment thereto, or the effectiveness of the subsequent releases of powers by the decedent if that agreement were construed as an amendment to the trust instrument. Both respondent and petitioner have considered the agreement of May 1, 1935, to be a contract between the decedent and his son and daughter-in-law. Respondent assumes that the releases by the grantor of powers reserved by him in the trust instrument should be construed as changing the terms of the trust in violation of the contract of May 1, 1935. It is unnecessary for us to decide whether this assumption is a valid one, for even were the documents of May 28, 1936, and December 7, 1943, releasing decedent's previously retained powers over the trust considered in violation of the contract of May 1, 1935, they would not thereby become void. There would arise a cause of action under the contract. *Tutunjian* v. *Vetzigian*, 299 N.Y. 315, 87 N.E. 2d 275 (1949).

Respondent also contends that since the letter of May 28, 1936, was not under seal and was not notarized, it was ineffectual to modify the trust agreement. Had this letter been executed prior to September 1, 1935, the effective date of an amendment of section 342 of the Civil Practice Act of New York, the laws of which govern the trust here being construed, there might be merit to respondent's argument. Under the provisions of section 342 of the Civil Practice Act, as amended, a written instrument made after September 1, 1935, which modifies, varies, or cancels a sealed instrument, executed prior thereto, shall not be deemed invalid or ineffectual because of the absence of the seal thereon. Likewise, this instrument is not invalid or ineffectual because of not being notarized. *In re Morgan's Will*, 177 N.Y.S. 2d 829 (1958).

The letter of May 28, 1936, and the instrument of December 7, 1943, effectively released all power and authority reserved in the trust instrument to the decedent except the power to appoint a trustee to replace the trustee who resigned in 1935. No such trustee was ever appointed. The mere unexercised retention of the right by the grantor of a trust to appoint a cotrustee, even though there

is no prohibition to appointing himself, does not constitute a power to alter, amend, or revoke so as to require the inclusion of the corpus of the trust in his gross estate under section 811(d)(2) of the Internal Revenue Code of 1939. *Estate of C. Dudley Wilson*, 13 T.C. 869 (1949) affirmed per curiam 187 F. 2d 145 (1951).

Respondent further contends that if, on May 28, 1936, the decedent validly surrendered his power to change the age at which the beneficiary was to be paid the trust principal and on December 7, 1943, validly surrendered his management control and right to remove the trustee, the value of the corpus is includible in his gross estate under section 811(c)(1)(B) of the 1939 Code because the decedent retained for his life the right to the income from the trust property. Section 811(c)(1)(B) of the 1939 Code, as amended by the Technical Changes Act of 1953, applies to tranfers made after March 3, 1931. Relying on *Smith* v. *United States*, 139 F. Supp. 305 (Ct. Cl., 1956), respondent contends that there was not a bona fide transfer effected, for tax purposes, on February 24, 1930, but such transfer occurred on May 28, 1936, or December 7, 1943, when the settlor completely surrendered his powers to alter, amend, or revoke the trust. The present case is distinguishable from *Smith* v. *United States*, *supra*, in that in the *Smith* case the grantor had reserved, in conjunction with her husband, the power to revoke the trust completely. This power was not released until her husband's death in 1933 at which time the transfer was held to have been effected. In *Estate of Robert J. Cuddihy*, 32 T.C. 1171 (1959), this Court stated its disagreement with the construction placed upon the term "transfer" in the *Smith* case but held that in any event the *Smith* case was inapplicable to an irrevocable trust created prior to March 4, 1931, wherein powers to alter or amend similar to those reserved in the instant case had not been released until a later date. This Court reaffirmed its holding in the *Cuddihy* case in *Estate of Ellis Branson Ridgway*, 33 T.C. 1000 (1960), on appeal (C.A. 3). We, therefore, conclude that section 811(c)(1)(B) is inapplicable to the transfer by decedent of the securities and insurance policies to the trust since this transfer was made before March 4, 1931.

The respondent next contends that the proceeds of the insurance policies are includible in the decedent's gross estate under section 811(g)(2)(B) of the 1939 Code which provides for such inclusion of proceeds of insurance policies receivable by beneficiaries other than the executor where the decedent possessed at his death any incidents of ownership in such policies exercisable either alone or in conjunction with any other person. In support of his position respondent relies upon *Estate of Myron Selznick*, 15 T.C. 716 (1950), affirmed per curiam 195 F. 2d 735 (C.A. 9, 1952), wherein proceeds

of insurance policies were held to be includible in the decedent's gross estate under section 811 (g) (2) (B) of the 1939 Code. In the *Selznick* case the insurance policies were made payable to the trust. In addition to the insurance policies the trust corpus included securities and the income of the trust was payable for life to the grantor. The grantor reserved the power to cancel the insurance policies with the consent of any two of three persons, the trustee and two appointees of the grantor whose appointment he could revoke and for whom he could substitute other appointees. The proceeds of the canceled policies were to be added to the trust corpus, the investment of which was controlled by the grantor without being limited to investments approved and permissible by law for trust funds. The combination of rights reserved by the grantor of the trust in the *Selznick* case was sufficient to permit the grantor during his lifetime to receive income from the investment of proceeds from canceled insurance policies. The right of the grantor to receive the income from the proceeds of the canceled insurance was held to constitute an incident of ownership in the insurance policies under section 811 (g) (2) (B). The interests in and controls over the trust which decedent in the instant case retained at the date of his death are not comparable to those retained by the grantor in the *Selznick* case.

Decedent in the instant case retained until the date of his death the right to the income from the trust in excess of that needed to pay the premiums on the insurance policies and the right to appoint a cotrustee to replace the trustee who had resigned. Any control that decedent would have acquired over the insurance policies had he appointed himself cotrustee would have been control over the policies jointly with the corporate trustee as trustee only and such control would be solely for the benefit of the trust. Such control as trustee would not constitute incidents of ownership in the insurance policies in decedent except in his capacity as trustee for the benefit of the trust.

The trust income was made up of dividends on the insurance policies and securities in the trust. Although decedent, from the inception of the trust in 1930 until the date of his death, had the right to receive the income from the trust in excess of that required to pay the premiums on the insurance policies, there was no such excess income and he, in fact, never received any such income. This right of decedent to receive the trust income in excess of that required to pay the insurance premiums was a right reserved by him as grantor and thus a right for his personal benefit and not a right as trustee. However, the right to receive the dividends on the insurance policies which formed a part of the trust income was assigned absolutely to the trustees for the benefit of the trust and could

inure to the personal benefit of the grantor only if such income exceeded the premiums on the insurance policies. In *Estate of Lena R. Arents*, 34 T.C. 274 (1960), the decedent, on June 4, 1932, created an irrevocable trust to which she transferred securities and insurance policies on the life of her husband, which policies had previously been assigned absolutely to her, reserving to herself for life the trust income in excess of that necessary to pay the premiums on the insurance policies. The trustees were directed to use the dividends on the insurance policies to pay the premiums on such policies and if a dividend on a specific policy exceeded the premium on such policy, to use the excess to pay premiums on other policies in the trust. In the *Arents* case the total income from the trust exceeded the amount necessary to pay the premiums on the insurance policies and the excess was paid to the grantor. We held that the value of the insurance policies at the date of death of the grantor of the trust was not includible in her gross estate under the joint resolution of March 3, 1931, which applies to transfers made after March 3, 1931, and before June 7, 1932, since she had not retained for her life the possession or enjoyment of, or the income from, the insurance policies. We there stated:

Aside from the dividends earned by the policies which were directed under the trust instrument to be applied to the payment of premiums, the policies were nonproductive. Consequently, the sole income arising from the policies by way of dividends (the amount of which is not shown by the record herein) was reflected by the increase in the overagè of excess investment income which the decedent received during her life. The trustee was without power to collect on the policies during the life of the decedent's husband (who has outlived her) or otherwise to dispose of them. A somewhat similar situation existed in *Estate of Charles O. Smith*, 23 T.C. 367, involving the question whether the decedent was entitled to a marital deduction with respect to amounts paid by him as premiums on life insurance policies which he had transferred in trust. The corpus of the trust consisted solely of insurance policies on the life of the settlor-decedent. A provision appeared in the trust instrument entitling the decedent's wife to receive the net income arising from the trust for her life. We there held this provision to be meaningless * * *

The *Arents* case did not involve insurance under policies upon the life of the decedent so as to require a determination whether the decedent retained incidents of ownership in the policies under section 811(g)(2)(B) of the 1939 Code. However, by analogy, in the instant case the fact that the dividends on the insurance policies constituted a part of the trust income which was retained by decedent for life to the extent not required to pay premiums on such insurance policies is of no greater significance in determining whether decedent retained incidents of ownership in the insurance policies than it was in the *Arents* case in determining whether decedent therein had re-

tained possession or enjoyment of or income from the insurance policies there involved. Decedent in the instant case was 84 years old when he died and the entire trust income from the insurance dividends and securities had never been sufficient in any year to pay the premiums on the insurance policies. The possibility that decedent might have lived long enough that the insurance dividends would exceed the premiums due on the policies in any year is too remote to constitute an "incident of ownership" in the insurance policies. Cf. *Commissioner* v. *Hall's Estate*, 153 F. 2d 172 (C.A. 2, 1946), affirming a Memorandum Opinion of this Court.

We agree with the petitioner that decedent did not possess at his death any incidents of ownership in the insurance policies transferred to the trust.

Respondent argues in the alternative that under the provisions of section 811(g)(2)(A) of the 1939 Code the proceeds of the insurance policies are includible in decedent's gross estate to the extent purchased with premiums paid by him in proportion that the amount so paid by the decedent bears to the total premiums paid for the insurance.

Section 811(g)(2)(A) requires the inclusion in the gross estate of proceeds of insurance policies upon the life of decedent receivable by beneficiaries other than the executors to the extent purchased with premiums paid directly or indirectly by decedent, even though decedent at the date of his death had no incidents of ownership in such policies. The legislative history of this provision which was incorporated in the Internal Revenue Code of 1939 by section 404(c) of the Revenue Act of 1942 is reviewed in detail in *Estate of Ellis Baker*, 30 T.C. 776 (1958). It is applicable to estates of decedents dying after the effective date of the Revenue Act of 1942 (Oct. 21, 1942), but in determining the proportion of the proceeds of an insurance policy includible in his gross estate, the premiums paid by decedent on or before January 10, 1941, should be excluded if at no time after that date the decedent possessed an incident of ownership in the policy. For the purposes of section 811(g)(2)(A) it is of no consequence that decedent possessed no incidents of ownership in the insurance policies at the date of his death if he possessed such incidents of ownership after January 10, 1941. Cf. *Estate of Louis Solowey*, 15 T.C. 188 (1950), affirmed per curiam 189 F. 2d 968 (C.A. 2, 1951), certiorari denied 342 U.S. 850.

Since decedent did not surrender his management control of the securities forming a part of the corpus of the trust and his right to remove the trustees without cause until after January 10, 1941, the question arises whether these retained powers over the trust, combined with the right to receive the income of the trust in excess

of the amount necessary to pay insurance premiums, operated to give decedent incidents of ownership in the insurance policies.

Incidents of ownership are not confined to ownership in the technical, legal sense but include the right of the insured or his estate to the economic benefits of the insurance policy and such rights as the power to change the beneficiary, to cancel the policy, and to borrow against its cash surrender value (Regs. 105, sec. 81.25, as amended by T.D. 5239, 1943 C.B. 1081). In *Commissioner* v. *Treganowan*, 183 F. 2d 288 (C.A. 2, 1950), reversing 13 T.C. 159, followed in *Estate of William E. Edmonds*, 16 T.C. 110 (1951), the court held an amount, receivable upon the death of a member of the New York Stock Exchange by his widow, in accordance with the provisions of the constitution of the Exchange, to be includible in such decedent's gross estate as insurance payable to beneficiaries other than his executors, even though as a member of the Exchange, he had no right to change the beneficiaries or any interest which he could pledge or upon which he could borrow. The court stated:

From both the broad language used and its inclusive interpretation, it is thus clear that such powers as to receive the surrender value of the insurance or to put another in one's place as the insured are incidents of ownership. An Exchange member does have the power to sell his seat, thus divesting his beneficiary of any right to payments, and entitling the purchaser to the same insurance which the seller has had. This power to cancel one's own engagement and substitute another seems to us an incident of ownership within the statutory meaning. * * *

In the instant case decedent, prior to his surrender on December 7, 1943, of powers and authority over the trust to which the insurance policies were assigned, could likewise act in such a manner as to change the value of the insurance policies assigned to the trust. Decedent as grantor had reserved the right to direct the investment of the securities in the trust and to receive the income in excess of that necessary to pay the premiums. Decedent, having also reserved the right to discharge the trustees without cause and appoint trustees of his own choosing, was assured of having trustees who would follow his direction as to the investment of the trust funds. Cf. *van Beuren* v. *McLoughlin*, 262 F. 2d 315 (C.A. 1, 1959), certiorari denied 359 U.S. 991. The investment of the trust fund was not limited to investments approved by law for trust funds and investments could be made in common stocks. The trustees were to determine any question that might arise as to whether amounts of receipts and disbursements should be treated and accounted for as income or principal. Decedent, had he chosen to do so, prior to December 7, 1943, could have directed that all the securities in the trust fund be sold and the proceeds placed in currently non-income-producing stocks which in his opinion would increase in value or

produce a higher income in some future year. This could have required borrowing against the insurance policies to pay the premiums thereon. These powers, reserved in decedent as grantor to handle the trust corpus in a way that might necessitate the use of the loan value of the insurance policies in an effort to increase the future income of the trust for the ultimate benefit of the grantor individually as well as for the trust, while differing in degree, are not distinguishable in principle from the rights reserved by the grantor of the trust in *Estate of Myron Selznick, supra,* to increase his income from the trust by surrendering the insurance policies for cash and adding such cash to the corpus of the irrevocable trust, the income of which he had retained for life. Decedent saw fit to reserve unto himself as grantor of the trust until December 7, 1943, powers and controls over the trust that could have been exercised in such a manner as to affect the interests of the trust beneficiary in the insurance policies. The fact that decedent did not actually use his reserved powers prior to the surrender thereof in December 1943 is immaterial. The facts in *Estate of Myron Selznick, supra,* show that the grantor of the trust considered therein had never used his reserve power to cancel any of the insurance policies during his lifetime. It is the existence of the right, power, or authority rather than its exercise or the likelihood of its exercise, which is controlling. *Adeline S. Davis,* 27 T.C. 378, 382 (1956).

The proceeds of the insurance policies transferred to the trust are includible in the decedent's gross estate to the extent applicable to premiums paid by decedent, Newcomb Carlton. The payment of premiums by the trustees from the trust income and the payment of premiums by Winslow Carlton are not indirect payments by decedent. *Estate of Edmund W. Mudge,* 27 T.C. 188 (1956).

The petitioner contends that section 811(g)(2)(A) of the Internal Revenue Code of 1939 is unconstitutional as applied to the facts of this case. The recent decision of the Supreme Court in *United States* v. *Manufacturers National Bank of Detroit,* 363 U.S. 194 (1960), held section 811(g)(2)(A) of the 1939 Code not to be unconstitutional as applied to premiums paid after January 10, 1941, with respect to policies in which decedent retained no incidents of ownership. Upon reasoning analogous to that used by the Supreme Court in the *Manufacturers National Bank* case, this Court has held section 811(g)(2)(A) constitutional as applied to premiums paid prior to January 10, 1941, where decedent retained incidents of ownership after that date. *Estate of Ellis Baker, supra.* See also *Estate of Clarence H. Loeb,* 29 T.C. 22 (1957), affd. 261 F. 2d 232 (C.A. 2, 1958). We hold section 811(g)(2)(A) to be constitutional as applied to the facts of this case.

Since we have held that the value of the securities is not includible in the gross estate, the question raised by the petitioner concerning the date of valuation of the securities becomes moot.

Respondent agrees to the adjustments for administrative expenses and fees as contended for by petitioner and such adjustment should be included in the computation of tax under Rule 50.

Reviewed by the Court.

*Decision will be entered under Rule 50.*